**SMITH EIBELER, LLC**
**Robert W. Smith, Esq. ID# 044341987**
**Christopher J. Eibeler, Esq. ID# 031772004**
**101 Crawfords Corner Road, Suite 1-105R**
**Holmdel, New Jersey 07733**
**(732) 935-7246**
**Attorneys for Plaintiff**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

```
-----------------------------------------------------------------X
                                          :   CIVIL ACTION NO.
NICHOLAS WALTERS,                         :
                                          :
          Plaintiff,                      :
                                          :
v.                                        :
                                          :
SAFELITE FULFILLMENT, INC.,               :   COMPLAINT AND JURY DEMAND
and ABC COMPANIES (1-10)                  :
(fictitious names of unknown entities),   :
                                          :
          Defendants.                     :
                                          :
-----------------------------------------------------------------X
```

Plaintiff Nicholas Walters, having an address of 360 Christian Hill Road, Brooklyn, Connecticut 06234, by way of Complaint and Jury Demand against Defendants Safelite Fulfillment, Inc. (hereinafter referred to as "Safelite" or the "Company") and ABC Companies (1-10) (fictitious names of unknown entities) (hereinafter collectively referred to as "Defendants") says as follows:

### FACTS COMMON TO ALL COUNTS

**The Parties, Jurisdiction and Venue**

1.      Defendant Safelite provides auto glass windshield installation services to customers through a network of various shop locations.

2.      Defendant Safelite maintains a service center at 2001 West Route 70, Cherry Hill, New Jersey, 08002 (hereinafter referred to as the "Cherry Hill location") and operates its business throughout the State of New Jersey.  Defendant Safelite identifies its principal business address as 112 Lehigh Street, Fairfield, New Jersey in its New Jersey state corporate filings.

3.      Defendants ABC Companies (1-10) are fictitious sole proprietorships, companies, limited liability companies, partnerships, and/or other companies/entities who are not specifically named defendants, who are unknown to Plaintiff at this time but who may be identified during discovery in this matter, and who are responsible to Plaintiff for the claims set forth herein and/or which companies are responsible to Plaintiff as an employer, and/or an aider and/or abettor for claims set forth herein.

4.      Plaintiff, Nicholas Walters ("Walters") resides at 360 Christian Hill Road, Brooklyn, Connecticut 06234.

5.      The relevant conduct associated with Plaintiff Walters's claims relate to and arise out of his employment in New Jersey and retaliation and/or associational discrimination respecting complaints and objections made by Plaintiff Walters and assistance provided by Plaintiff Walters to employees discriminated against and terminated in New Jersey, including Greg Manning and Shelby Klein.

6.      Jurisdiction is proper in this district pursuant to 28 U.S.C. §1332 because the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

7.      Venue is proper in this district under 28 U.S.C. §1391(b) and (c) because:

a.      Defendant Safelite is a resident of New Jersey for purposes of venue pursuant to 28 U.S.C. §1391(b)(1) and (c)(2); and

b.      A substantial part of the events or omissions giving rise to the claims in this matter occurred in New Jersey pursuant to 28 U.S.C. §1391(b)(2).

**Facts**

8.      Plaintiff Walters began his employment with Safelite in or about 2005 working out of the Safelite location in Cherry Hill, New Jersey.

9.      Plaintiff Walters was promoted to the position of Assistant Store Manager in May 2011 continuing to work out of the Safelite location in Cherry Hill, New Jersey.

10.     Plaintiff Walters was again promoted to the position of Store Manager on or about September 28, 2015.

11.     Plaintiff Walters performed up to and/or exceeded the reasonable expectations of the Company throughout his employment.

12.     In fact, at no time during Plaintiff Walters's employment had he ever received a performance evaluation that rated his job performance anything less than meeting or exceeding expectations.

13.     In or about 2014, Plaintiff Walters began having concerns about the new management team of the Philadelphia territory, including, with respect to Keenan McCafferty and Sam Lok.

14.     Kennan McCafferty was employed in the position of District Manager at times relevant to this matter.

15.     Sam Lok was employed in the position of Operations Manager at times relevant to this matter.

16.     Specifically, Plaintiff Walters observed that Mr. McCafferty and Mr. Lok and

others in the management team were not abiding by Safelite's Code of Conduct policy or acting in the best interests of the Company.

17.     For example, in or about late 2014/early 2015, Mr. Lok approached Plaintiff Walters and offered him a promotion to the Store Manager position of the Absecon store.

18.     Mr. Lok and Mr. McCafferty advised Plaintiff Walters that the current Store Manager, Shelby Klein, who was on pregnancy leave at the time, was going to be terminated after she returned from pregnancy leave.  They specifically stated that they had planned on waiting until after Ms. Klein returned from pregnancy leave so it would not seem as if she was being fired for taking maternity leave.

19.     Plaintiff Walters objected to Mr. Lok, Mr. McCafferty and the Company's decision to terminate Ms. Klein and told them that what they were doing was "unethical" and that he would not accept the promotion under these circumstances.

20.     Soon thereafter, Plaintiff Walters was called into a meeting with Mr. Lok, Mr. McCafferty and Greg Byrd.

21.     Greg Byrd was employed in the position of Regional People Business partner for the Mid-Atlantic region at times relevant to this matter.

22.     During the meeting with Mr. Lok, Mr. McCafferty and Mr. Byrd, Mr. Byrd advised Plaintiff that the Company was going to terminate Ms. Klein after she returned from maternity leave and he wanted to promote Plaintiff Walters to the Store Manager position of the Absecon store.

23.     Plaintiff Walters again rejected the promotion, reiterating that he did not want to be put in this situation because what they were doing to Ms. Klein was "unethical" and in

violation of the Company's Code of Ethics.

24.     After turning down the job, Plaintiff Walters requested assistance in transferring to Connecticut so that he could get out of the Philadelphia region and its management team.

25.     Mr. Walters's request to transfer to Connecticut was eventually granted in or about March 2015.

26.     Ms. Klein was terminated from her employment after she returned from pregnancy leave.

27.     Ms. Klein filed a lawsuit alleging pregnancy discrimination and unlawful termination in the United State District Court for the District of New Jersey, which is captioned Shelby Klein v. Safelite Group, Inc. d/b/a Safelite Autoglass, John Does 1-100 and ABC Corps. 1-100, Civil Action 1:16-CV-00726 (JHR)(JS).

28.     Following Plaintiff Walters's transfer to Connecticut region and promotion, he continued to perform up to and/or exceeded the reasonable expectations of the Company.

29.     In fact, according to his 2016 Performance Evaluation, the Company evaluated Plaintiff Walters's performance as a Store Manager as "consistently demonstrate[ing] competency expectation."

30.     In or about July 2016, Greg Manning, who had worked with and under Plaintiff Walters out of the Cherry Hill, New Jersey location, returned to work from a medical leave of absence as a result of tearing a ligament in his ankle which required surgery.

31.     Greg Manning's employment was terminated in January 2016 and he has filed a lawsuit alleging retaliation, hostile work environment and disability discrimination under the New Jersey Law Against Discrimination which action is pending in the United State District Court for the

District of New Jersey, which is captioned <u>Gregory Manning v. Safelite Fulfillment, Inc.,et al.</u>, Civil Action 1:17-cv-0284-RMB-JS.

32.    Nick Moran became Greg Manning's direct supervisor upon his return to work in July 2016.

33.    Nick Moran was employed as the Store Manager for the Cherry Hill, New Jersey location at times relevant to this matter.

34.    Upon Greg Manning's return to work, Nick Moran began creating a hostile work environment towards Mr. Manning because of his disabilities, perceived disabilities and need for reasonable accommodations as a result of his disabilities.

35.    Nick Moran created a hostile work environment directed at Greg Manning, which included regular mocking, taunting and making other offensive comments or other conduct because of Mr. Manning's disabilities and/or perceived disabilities, including with respect to diabetes and obesity.

36.    Some examples of Nick Moran's harassing and discriminatory comments and/or conduct towards Greg Manning include the following:

- Referring to Greg Manning as, "useless";

- Accusing Greg Manning of being "fat":

- Accusing Greg Manning of being "lazy";

- Telling Greg Manning that if he lost some weight, maybe he wouldn't be such a waste of an employee;

- Telling Greg Manning, "If you lost weight you would not be diabetic";

- Stating to Greg Manning, "I'm surprised you even showed up today";

- Threatening Greg Manning, "I'll be watching you on the GPS today"; and

- Telling Greg Manning, "You should not have a job here".

37.     After returning to work in July 2016, Greg Manning began to suffer from symptoms related to his disabilities such as lightheadedness, dizziness, and nausea.

38.     In August 2016, Greg Manning informed Nicholas Moran that the diabetes and extreme heat were causing his health to suffer, including causing him to become lightheaded, dizzy and nauseous.

39.     Greg Manning specifically informed Mr. Moran that he was concerned he was going to pass out while on the job, especially while driving.

40.     Greg Manning requested that Mr. Moran provide him a temporary reduction in dispatch assignments or work, particularly on hot days, as a result of his disabilities.

41.     Greg Manning specifically advised Mr. Moran that he needed to stop and take a break at times when his sugar levels were unstable and going up and down.

42.     Mr. Moran summarily rejected Greg Manning's requests for reasonable accommodations by responding, "if you can't do the work, you should just quit."

43.     Greg Manning, who remained in contact with his former manager, Plaintiff Walters, advised Plaintiff Walters that he was being harassed and discriminated against by Mr. Moran.

44.     Plaintiff Walters responded by encouraging Mr. Manning to make a complaint to the Company concerning Mr. Moran's unlawful conduct and to follow the Company's Code of Ethics and other Company policies regarding discrimination, harassment and retaliation.

45.     In or about mid-August 2016, Mr. Manning complained to Dani Sennet about Mr.

Moran's refusal to provide accommodations and the harassing and discriminatory conduct directed at him as a result of his disabilities and/or perceived disabilities.

46.     Dani Sennet was employed in the position of LOA Specialist at times relevant to this matter.

47.     Greg Manning informed Ms. Sennet that he had asked Mr. Moran for accommodations due to his disability and that Mr. Moran had denied his requests for assistance.

48.     Greg Manning further complained to Ms. Sennet that Mr. Moran was continually harassing Mr. Manning because of his disabilities, including calling him offensive and discriminatory names.

49.     In an email sent to Ms. Sennet at 6:13 a.m. on August 17, 2016, Greg Manning wrote:

> I want to file a complaint against Nick Moran he's been treating me different because of my disability, I can't help the way I feel, I have a sickness and he's been giving me a hard time.  I included a pic from a text he sent me.

50.     Ms. Sennet responded to Manning by email informing him that she had addressed his email to Mr. Lok and Mr. Byrd.

51.     Manning responded by sending an email to Ms. Sennet, which reads:

> Hi Dani,
>
> Thank you, I know you are helping and I really appreciate everything on your end.  I feel like I'm being mistreated by [Mr. Moran].  I've missed some days because of my disability and he gives me a hard time and makes comments about me missing the time.  I have an illness and I'm working on getting better and see my doctor a lot for it.   Every day I've missed has been accompanied with a note from my doctor.  I've asked to be given a lighter work load because of the heat and it's ignored, I'm working my hardest for this company and I feel like he's abusing

me and saying inappropriate things about my disability.  He's
making it a personal issue with me and I feel harassed.

52.     Ms. Sennet forwarded Manning's emails to Mr. Byrd via email sent on August 17,

2016 at 6:50 p.m.

53.     Mr. Manning sent an email directly to Mr. Byrd and People Direct[1] on August 17,

2016 at 12:04 p.m., to complain about Mr. Moran's harassment and discriminatory conduct.  The

email reads:

> Hello, my [name] is Greg Manning I work at store 830 in Cherry
> Hill New Jersey.  I have diabetes and I feel like I'm being
> mistreated by my boss Nick Moran.  I've missed a few days
> because of my disability and he gives me a hard time and makes
> comments about me missing the time.  I have an illness and I'm
> working on getting better and see my doctor a lot for it.  Every
> day I've missed has been accompanied with a note from my
> doctor.  I've asked to be given a lighter work because of the heat
> and it's ignored, I'm working my hardest for this company and I
> feel like he's abusing me and saying inappropriate things about
> my disability.  I would like to file a complaint about this situation
> and get the problem resolved.  He's making it a personal issue
> with me and I feel harassed.  Also I sent a screen shot of a text he
> sent me.

54.     Despite Mr. Manning's repeated complaints concerning harassment,

discrimination and other unfair treatment from Mr. Moran, the Company refused to conduct any

investigation into Mr. Manning's protected complaints.

55.     Instead, Ms. Sennet, Mr. Byrd, Mr.  Moran, Mr. McCafferty and Mr. Lok

conspired together in order to terminate Mr. Manning's employment in retaliation for his

protected complaints.

56.     In fact, Ms. Sennet, Mr. Byrd and others routinely shared all the confidential

---

[1] Upon information and belief, People Direct is a part of the Company's HR function.

information concerning Mr. Manning's complaints with those persons who were responsible for creating the hostile work environment, discriminatory conduct and retaliation against Mr. Manning, including Mr. Moran, Mr. McCafferty and Mr. Lok.

57.    Additionally, no one ever interviewed Mr. Manning concerning his protected complaints.

58.    Mr. Manning also complained to Mr. Lok about Mr. Moran's harassing and discriminatory conduct and failure to provide him accommodations for his disabilities.

59.    Mr. Manning specifically informed Mr. Lok that he was being abused by Mr. Moran about his weight and disability and that he wanted to file a formal complaint against him.

60.    Mr. Lok responded to Mr. Manning's complaints by advising him that his "hands were tied" because Mr. Manning had already complained to Human Resources ("HR").

61.    Mr. Manning also complained directly to Mr. Byrd.

62.    Mr. Byrd never responded to any of Mr. Manning's complaints.

63.    Mr. Manning was unable to work from August 17 through August 22, 2016 as a result of his disabilities.

64.    Mr. Manning texted Mr. Moran to advise him that he was not feeling well and could not come to work.

65.    In response to Mr. Manning's text message Mr. Moran responded, "You have got to be kidding me. You've called out more then you actually work."

66.    Mr. Manning sent Ms. Sennet an email on August 22, 2016 at 10:08 a.m. that reads:

> See nothing changes, I expressed that I'm over worked and it was causing problems with my diabetes, and I get 6 jobs again today. I

asked to be at 5 that's where I'm comfortable at and my request is ignored once again. Can you please help me out with this issue? Thanks.

67.     In the voicemail message to Ms. Sennet referenced in her email, Plaintiff states:

Hey Dani, it's Greg Manning I got your voicemail. My doctor does have the paperwork, just waiting for them to let me know. I have an appointment Friday, so I told them, I could pick them up Friday, so maybe she's not doing them as quick as she could have been. But I know what you said, just to take them in on Friday, but I actually took them over earlier but I said I'll pick them up on Friday and that's the next time I expected to get her. You know I don't want to be bitching and complaining all the time, I mean I asked to have 5, they gave me 6, it's not a big deal but that when I start getting shaky at the end of the day a lot of the times, working outside in the sun and this heat and just know, overall, I guess it's just been a—a shock to my body you know, being so slow on my ankle- you know I just trying to ease back into it but I feel like you know, I'm getting 6 every day and it just puts more pressure on me- I'm trying to get done and work fast and that's when I start getting shaky and you know- my head starts spinning, and my sugar drops up and down, and but you know I got 6 today- I'm going to try and do the 5 and I'll see how I feel. I don't want to start a job feeling like that again and you know- my work suffers because I'm not feeling good or you know I starting to get shaky or whatever. But I just wanted to touch base with you and see if there is anything to do- I called Sam I don't get no response, I text him, I don't get no response, I emailed Greg Byrd and the HR department also and no one ever got back to me except for you so, I know, you are the only one really trying to work with me and help me and I really do appreciate it. Um so I just wanted to give you a call back and let you know I got your message. Thank you very much.

68.     Mr. Byrd forwarded Ms. Sennet's email to Mr. McCafferty via email sent at 3:35 p.m. on August 22, 2016, asking "Keenan... Can you call me when you have time?"

69.     The following day, Mr. McCafferty responded to Mr. Byrd's email by accusing Mr. Manning of "trying to play with the system."

70.     In his email, Mr. McCafferty further advised Mr. Byrd that he was now

specifically targeting Mr. Manning by checking on his routes as a result of Mr. Manning complaining to People Direct.

71.     Mr. McCafferty further commented that he believed that Mr. Manning either did not think management was looking at his routes or he was not "smart enough" to look at his routes before complaining to People Direct.

72.     Mr. Byrd did not advise Mr. McCafferty that his email nor actions set forth in his email were inappropriate or could be viewed as retaliatory.

73.     Instead, Mr. Byrd acquiesced to Mr. McCafferty's email by responding, "Got it."

74.     On or about August 24, 2016, Mr. Manning's health care provider provided the Company with medical documentation concerning Mr. Manning's disabilities and need for reasonable accommodations.

75.     The Company advised Mr. Manning that the Company would provide Mr. Manning with reasonable accommodations.

76.     Mr. Moran, however, refused to provide Mr. Manning any accommodations, including reducing his dispatches when necessary.

77.     Mr. Manning complained to Mr. Moran concerning his refusal to provide the ADA accommodations of a reduction in dispatches.

78.     In response, Mr. Moran told Mr. Manning, "We are busy. Too bad, you'll probably blow one off anyway."

79.     Mr. Moran further reprimanded Mr. Manning for "going to HR" and "making stuff up."

80.     Mr. Moran accused Mr. Manning of "just trying to get out of work" and was just

doing what he could to get one over on the Company because "you are lazy and don't want to work anymore."

81.     Mr. Moran also threatened Mr. Manning with retaliation for going to HR, including by telling Mr. Manning that he is "going to keep tabs on [Manning]" and going to do everything in his power to make sure he does not have a job with the Company much longer.

82.     Mr. Moran made clear to Mr. Manning that as his supervisor and Store Manager of the Cherry Hill location, Mr. Moran would get him terminated for complaining to HR about his conduct.

83.     Mr. Moran continued to taunt Mr. Manning throughout the Fall 2016.

84.     During one conversation with Mr. Manning, Mr. Moran commented to Mr. Manning, "All of a sudden you're fine" and "Now you can work outside because it's not hot outside."

85.     Mr. Manning responded that heat is a re-occurring factor with regards to his diabetes.

86.     Mr. Moran responded, "If you were not fat, you would not be having this problem."

87.     Consistent with his stated plan to retaliate against Mr. Manning for complaining to HR, Mr. Moran began retaliating against Mr. Manning, including by providing an unwarranted and pretextual discipline warning.

88.     In or about October 2016, Mr. Manning was issued a Performance Improvement Plan ("PIP") by Mr.  Moran for allegedly falsifying signatures on work orders for customer warranties.

89.     When presented with the write-up, Mr. Manning responded that throughout the duration of his employment he had always been instructed to write a squiggly line on the document for customers who were not present during the repair and then circle and write a scribble on the signature line.

90.     Mr. Moran responded that he did not care and threatened Mr. Manning to either sign the disciplinary form or be fired.

91.     On November 18, 2016, Ms. Sennet sent an email to Mr. Moran, Mr. Lok and Mr. McCafferty informing them that the accommodation for Mr. Manning had expired on November 16, 2016, and that she was closing the case.

92.     Mr. Lok responded to Ms. Sennet's email by asking, "Does this mean we are going to separate employment?"

93.     Ms. Sennet did not respond to Mr. Lok's question as to whether the Company was going to terminate Mr. Manning.

94.     Ms. Sennet also never took any steps to investigate Mr. Lok's expressed unlawful retaliatory motive to terminate Mr. Manning.

95.     On December 1, 2016, Mr. McCafferty sent an email to Mr. Moran, Mr. Lok, Robert McColgan, Steven Sztubinski and Joe Watts falsely accusing Mr. Manning of a compliance violation and informing that he wanted to terminate Mr. Manning

96.     In the email, Mr. McCafferty admitted that he was "sure [Manning] will attempt legal action."

97.     Mr. McCafferty sent a second email on December 1, 2016, to Mr. Laski, Mr. Byrd and Mr. Lok, falsely accusing Mr. Manning of a compliance violation and informing them that he

wanted to terminate Mr. Manning.

98.     In this email, Mr. McCafferty stated that he was "sure [Manning] will be calling to say we are out to get him and set him up.  Just giving a heads up."

99.     On December 2, 2016, Mr. McCafferty sent an email at 3:28 p.m. to Mr. Laski and Mr. Byrd requesting information on how to get Mr. Manning's termination request to the appropriate committee for approval because "we want to move as quickly as possible."

100.    Mr. Byrd, who had still never investigated any of Mr. Manning's complaints concerning harassment, retaliation and discrimination, assisted Mr. McCafferty's attempt to expeditiously terminate Mr. Manning by quickly scheduling the issue of his termination before the committee pursuant to Mr. McCafferty's directive to him.

101.    On December 2, 2016, the Company placed Mr. Manning on administrative leave, claiming that Mr. Manning had caused some sort of damage to a window that Mr. Manning had allegedly replaced in September 2016.

102.    Mr. Manning called Plaintiff Walters to complain that he believed he was being retaliated against by Defendants.

103.    Plaintiff Walters responded that he would try to speak to someone who could help Mr. Manning in obtaining a fair, complete and thorough investigation into his complaints.

104.    After speaking with Mr. Manning, Plaintiff Walters sent an email on December 2, 2016 at 9:57 p.m. to Mr. Sweigart titled "Concerned about a situation", which reads:

> Dale,
>       I would like to talk with you about a situation that was brought to my attention.  The technician is Greg Manning.  He works in the Cherry Hill location and was placed on administrative leave today.  They placed him out on surcumstantial [sic] findings.

He reached out to me today and was very concerned about the process in which its being handled.

From what I herd [sic] it's a issue of a vehicle not being primed.  He replaced a back glass in a Nissan Versa.  The window was not broke and he claims to have [sic] fiber lined it out and did not need to trim the body.

I reviewed the warrantee work order today.  A few things that stood out to me.  First was the glass was used.  Also there was no pre or post inspection done, along with no pictures loaded into MRM.

I would only ask that you look at this for me.  Greg is a incredibly talented tech that has been with us for over ten years.  I personally worked over him and never once seen him break a IC policy.  He takes pride in his work and puts customers safety first.  There are multiple thoughts running through my head as to what it could be.  One that jumps out is the lack of documentation on the Tech that reported it.  He listed no damage on the WO.  To me that could be addressed the same as far as a ICC issue.  Was the damage their prior to him working on it or did he cause it and try to cover up.  Also I know their have been issues with the management team and Mr. Manning.  He had complained of unfair treatment due to his diabetes and weight.

Also, if the stratches did not break the etching layer of primer and do not interlock with the bonding substrate is that a safety issues we would be willing to lose talent over?  Personally I find it to be a great coaching experience.  Thank you very much ahead of time.

105.    Mr. Sweigart responded to Plaintiff Walters via email sent on December 5, 2016 at 6:28 p.m. stating:

Nick,

I am aware of the situation in Philly. I know you're concerned, but I would let Philadelphia and Greg Byrd deal with the situation.  I'm confident that they will make the right the decisions for Safelite and Greg.

106.    Mr. Sweigart forwarded Plaintiff Walters email to Mr. Laski, Mr. Byrd and Mr.

McCafferty on December 5, 2016 at 8:26 p.m. and stated:

> Gents,
> Just forwarding this as an FYI.   Looks like Greg Manning has
> reached out to our friend Nick Walters and Nick is concerned.

107.    Mr. Byrd responded to receiving Mr. Sweigart's email and Plaintiff Walters's

complaints by email sent on December 5, 2016 at 8:58 p.m. to Mr. Sweigart, Mr. Laski and Mr.

McCafferty stating, "Interesting…"

108.    Mr. McCafferty forwarded both Plaintiff Walters's email and Mr. Sweigart's

email to Mr. Lok on December 5, 2016 at 3:39 p.m.

109.    Thereafter, Mr. McCafferty forwarded both Plaintiff Walters's email and Mr.

Sweigart's email to Mr. Moran on December 7, 2016 at 1:31 p.m.

110.    Mr. Lok responded to Mr. McCafferty's email by email sent December 5, 2016 at

10:58 p.m., which reads:

> After reading this once more, I don't think Nick wrote this but
> rather just endorsed it.  His grammar, punctuation and choice of
> words are not likely written by Nick.  Either way Nicky is an idiot
> and so is Manning.

111.    Mr. Laski forwarded both Plaintiff Walters's email and Mr. Sweigart's email to

James Donais and commented "I [heart] this guy….I thought he would have terminated himself by

now."

112.    Mr. Laski had no legitimate non-discriminatory business reason to forward

Plaintiff Walters's email to Mr. Donais who was responsible for managing the Connecticut region

where Plaintiff Walters worked.

113.    Instead, the only reason for Mr. Laski to send Plaintiff's Walters's complaint

email to Mr. Donais was to further the Company's plan to retaliate against Plaintiff Walters in his own employment for complaining about and opposing the unlawful conduct directed at Mr. Manning and for encouraging Mr. Manning to exercise his rights under the law.

114.   James Donais responded, "Unreal."

115.   Mr. Donais then forwarded Plaintiff Walters's protected complaint to Adrienne Varney, who was the local HR representative for the Connecticut territory where Plaintiff Walters was employed.

116.   Mr. Donais's sharing Plaintiff Walters's protected complaint to Ms. Varney also was not for any legitimate non-discriminatory business reason, but instead, to further the Company's plan to retaliate against Plaintiff Walters in his own employment for opposing the unlawful conduct directed at Mr. Manning and for having encouraged Mr. Manning to exercise his rights.

117.   Ms. Varney took no action to investigate Plaintiff Walters's protected complaint and/or the Company's retaliatory actions taken against Mr. Manning and Plaintiff Walters.

118.   Ms. Varney further took no action to address any of the egregious breaches of confidentiality made by Mr. Laski and Mr. Donais in connection with their handling of Mr. Manning and Plaintiff Walters's protected complaints.

119.   On December 5, 2016, Mr. Manning's treating health care providers provided the Company with medical documents to extend Mr. Manning's request for reasonable accommodations.

120.   Mr. Manning sent an email to Greg Byrd and People Direct on December 6, 2016 at 2:08 a.m., which reads:

To whom it may concern:

I am writing with hope that I will receive the help needed to address a situation. I have been put on administrative leave for the alleged violations of the installation compliance.

My name is Greg Manning and have work [sic] for this establishment for over eleven years now.  Until the latest change in management in my location I have never had a issue nor complaint.  I have type 1 diabetes; this past fall I rehabbed myself back to work after a long difficult recovery.  As I'm sure your aware injuries to ankles take longer to heal on those of us suffering from this disease.  Upon my return to work I was being treated unfairly and discriminated against by my immediate manager Nicholas Moran.  I reported this conduct to my operations manager and local HR rep.  Nothing was done nor rectified.  The abuse continued on with him making remarks about my disability and making comments about my weight.

This past Friday December 2nd when I arrived at work I was cornered by members of the management team.  They told me I was being placed on administrative leave due to a installation compliance.  The work in question was done shortly after my return and around the time I filed a report.  What they are claiming is completely untruthful and against everything I am as a employee and a person.  They claim a rear glass was replaced by me without the pitch well being treated with 207 primer.  They showed me pictures for about a minute without a chance to review them.  There is no pre inspection nor post on file to show evidence that the second technician did not cause the damage himself.  I fully believe this is a attempt to have me removed from my position as a retaliation for the report previously filed.

It's a belief of mine that the technician that was selected to perform the warranty work was chosen because his brother is the district manager of this market.  He is a technician that is hardly called on to perform such work.   He also has a sketchy background as from what he has told me.  He has gone as far to say he was hired shortly after multiple complaints in the PA court system for driving without a license and a suspension.  In my tenure I have seen top talent let go for much less then what he has claimed to have done.

I would ask that for the integrity of this corporation that a full investigation be set forth by senior leadership towards the Philadelphia market.  This market was once filled with job pride and incredible talent.  We have lost that.  I again have never been accused of or been involved in any company violations regarding the installation process. Thank you.

121.   The Company, Mr. Byrd and People Direct took no action to investigate the complaints raised by Mr. Manning in his December 6, 2016 email.

122.   On December 7, 2016, Mr. Manning's attended a meeting with Mc. McCafferty and Mr. Lok, at which time he was informed that his employment with Safelite was terminated.

123.   In response to being advised that he was terminated, Mr. Manning stated he believed that the reason for his termination was as a result of his complaints of disability discrimination and constant harassment from Mr. Moran.

124.   In response, Mr. McCafferty stated to Mr. Manning, "This has nothing to do with that. You damaged the vehicle."

125.   Mr. Manning then complained directly to Mr. Lok by reminding him of his complaints and the fact that Mr. Lok nor anyone else did anything to investigate the complaints or stop Mr. Moran's unlawful conduct.

126.   After his termination, Mr. Manning lodged another complaint on December 8, 2016 through the Company's Ethics and Compliance Employee Hotline.

127.   The incident description of the complaint reads:

> In 08/2016, Greg Manning returned to work after being on sick leave.   Greg Manning missed a couple of days due to complications with diabetes.  Nick Moran would make comments such as, "You missed all of this time and now you need to be out. If you weren't so fat you wouldn't be having these problems. I'm going to do my best to get you out of here."
> Greg Manning called Sam to discuss what had been going on with Nick.  Greg Manning left two voice mails and sent text messages to Sam, but received no response.
> Greg Manning emailed human resources, people direct and Greg Byrd about Nick.  Greg Manning did not receive any responses.
> Dani was also emailed by Greg Manning about what was said to him by Nick.   Dani responded stating she would forward Greg

Manning's concerns to Sam and Greg Byrd.

Greg Manning spoke with his doctor and was told about the American Disabilities Act (ADA) because of being hassled by Nick. The doctor filled out the ADA paperwork for Greg Manning to protect him from being terminated due to missing work because of diabetes complications.  When Greg Manning took Nick the paperwork he remarked, "Oh you're just being a big baby.  You're lazy and just don't want to work."

Sam called Greg Manning and said nothing could be done because he went over Sam's head and now it's a human resources matter. Greg Manning told Sam about the voice mails and text messages. Sam remarked that he was busy and didn't have time to deal with petty matters.

Between 09/2016 and 11/2016, Nick continued to make derogatory comments and threatened to terminate Greg Manning.

On 12/02/2016, Nick called Greg Manning into his office.  Nick showed Greg Manning a picture of a scratch on the body of a vehicle underneath the glass.  Nick told Greg Manning that he did not follow procedure, by not using the primer, which caused the damage.   Greg Manning was shown closeup pictures of the damage.   However, there were no full pictures of the vehicle. Greg Manning felt the pictures that were shown to him could have been of any random vehicle.  Greg Manning stated Steve Mccafferty took the pictures and forwarded them to Nick. Although, the pictures taken were not in the work order.  Greg Manning felt Nick had Steve take the pictures because he knew Greg Manning could not be terminated because of the ADA.  Nick placed Greg Manning on administrative leave.

On 12/07/2016, Greg Manning was terminated by Keenen (phonetic spelling) due to not following procedures.  No pictures were provided to Greg Manning.  Greg Manning also asked for a copy of the compliance agreement and FIKA agreement, but neither of these were provided.

Greg Manning felt Nick set him up to be terminated.   Greg Manning also felt he was "screwed" because he was not one of Nick's buddies.

Greg Manning would like to have his job back and have actions taken against Nick so this will not happen to anyone else in the future.

128.   Despite Mr. Manning's hotline complaint specifically addressing the fact that Mr.

Byrd failed to do anything in response to his prior complaints, Dave Riber, the Director of Security,

assigned Mr. Manning's hotline complaint to Mr. Byrd to investigate.

129.   Once again, Mr. Byrd failed to conduct any investigation into Mr. Manning's protected complaints.

130.   Instead, Mr. Byrd forwarded the hotline complaint to Mr. Laski thereby again breaching the confidentiality of the complaint and conspiring to cover up Mr. Manning's complaints including the Company's unlawful and retaliatory actions in terminating Mr. Manning's employment.

131.   Mr. Laski responded, "Nonsense."

132.   Mr. Byrd did not investigate or take any action in connection with Mr. Laski's comment that Mr. Manning's complaint was "Nonsense."

133. On December 19, 2016, Mr. Byrd also forwarded Mr. Manning's hotline complaint to Michelle Beiter:

> Michelle…
> When you have a minute, can you please call me on this.  I want to brief you on this situation, as well as the involvement of a store manager in another region that involved himself in this investigation and provided information to the tech that was termed.

134. In response, Ms. Beiter took no action into Plaintiff Walters's complaints or Mr. Byrd's expressed retaliatory accusation that Plaintiff Walters "involved himself in this investigation."

135. Instead of investigating any of Mr. Manning and Plaintiff Walters's protected complaints as assigned by the Company, Mr. Byrd retaliated against Plaintiff Walters for objecting to the Company's unlawful treatment of Mr. Manning and encouraging Mr. Manning to exercise his rights under the law and the Company's Code of Conduct.

136. Thereafter, Plaintiff Walters was called into a meeting with Ron Gagnon and Adrienne Varney, during which he was advised that Mr. Byrd had called and would participate via speaker phone.

137. After getting Mr. Byrd on the speaker phone, Mr. Byrd became very angry and threatening toward Plaintiff Walters for writing the email to Mr. Sweigart.

138. Mr. Byrd exhibited extreme hostility toward Plaintiff Walters by repeatedly questioning him on why he thought he should be getting involved in Mr. Manning's complaints.

139. Plaintiff Walters responded that Mr. Manning did nothing wrong, was a valued employee for a long time and it was not right that the Company had set him up.

140. Mr. Byrd further questioned Plaintiff Walters concerning why he was sticking up for Mr. Manning.

141. Plaintiff Walters responded to Mr. Byrd by telling him what he did to Mr. Manning was wrong and what he is doing now is wrong.  Plaintiff Walters further reminded Mr. Byrd that "all I am doing is what the company preaches."

142. Mr. Byrd also reprimanded Plaintiff Walters for sending the email to Mr. Sweigart.

143. Mr. Byrd specifically accused Plaintiff Walters that he was going to get the Company sued as a result of sending the email to Mr. Sweigart.

144. Plaintiff Walters responded that they should be sued and that he would sue Mr. Byrd and the Company in a heartbeat if they did to him what they did to Mr. Manning.

145. As Mr. Byrd became angrier during the meeting, Plaintiff Walters commented that Mr. Byrd's conduct directed at him felt like an interrogation and that this is the reason why he

wanted to leave the Philadelphia area.

146. Plaintiff Walters also questioned Mr. Byrd concerning why he was acting so aggressively toward him and whether Plaintiff Walters should start looking for a new job for sending the email.

147. Mr. Byrd responded that he "will deal with you later."

148. After the phone call with Mr. Byrd, Mr. Gangon warned Plaintiff Walters that he should have not stuck up for Mr. Manning and that it was going to end Plaintiff Walters's career at Safelite.

149. The Company thereafter began retaliating against Plaintiff Walters, including issuing Plaintiff Walters an unwarranted and pretextual discipline warning on February 10, 2017 and putting him on a Personal Development Plan on February 20, 2017.

150. On or about April 10, 2017, the Company terminated Plaintiff Walters.

151. The termination of Plaintiff Walters's employment was in retaliation for the complaints he raised concerning Mr. Manning and Defendants' failure to conduct any investigation into any of the numerous complaints of harassment, discrimination and retaliation.

152. As a result of Defendants' conduct, Plaintiff Walters has suffered emotional distress, economic loss and other compensatory damages.

### FIRST COUNT

**LAD – RETALIATION**
**N.J.S.A. 10:5-1 et seq.**

153. Plaintiff repeats and reallege each of the prior allegations of the within Complaint as if set forth at length herein.

154. Defendants are employers under the New Jersey Law Against Discrimination ("LAD").

155. Plaintiff Walters is an employee and/or person under the LAD.

156. Plaintiff Walters complained and objected to Defendants concerning the discriminatory, harassing and retaliatory conduct toward Mr. Manning and the Defendants' failure to investigate Mr. Manning's complaints.

157. Plaintiff Walters further aided and/or encouraged Mr. Manning in the exercise or enjoyment of rights provided to him and/or protected under the LAD.

158. Defendants' conduct and/or treatment of Plaintiff Walters, including threatening him, issuing discipline, putting him on a performance improvement plan and terminating Plaintiff Walters's employment, were in retaliation and reprisal for Plaintiff Walters's having opposed practices or acts forbidden under the law and/or because Plaintiff Walters complained on behalf of Mr. Manning and/or aided or encouraged Mr. Manning in the exercise or enjoyment of rights provided to Mr. Manning under the LAD.

159. The retaliatory actions taken by Defendants against Plaintiff Walters are in violation of the LAD.

160. Defendants' acts or omissions were the cause of Plaintiff Walters's harm and the Defendants' acts or omissions were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions

161. As a direct and proximate result of Defendants' violation of the LAD, Plaintiff Walters has suffered compensatory, emotional distress and other damages.

**WHEREFORE**, Plaintiff Walters demands judgment against Defendants for harm suffered due to the aforesaid violation of the LAD as follows:

A.      Back pay and benefits;

B.      Front pay and benefits;

C.      Compensatory damages;

D.      Consequential damages;

E.      Punitive damages;

F.      Reinstatement;

G.      Pre-judgment interest and enhancements to off-set negative tax consequences;

H.      Any and all attorneys' fees, expenses and/or costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Plaintiff in the prosecution of this suit (including enhancements thereof required to off-set negative tax consequences and/or enhancements otherwise permitted under law);

I.      Declaring that Defendants have violated the LAD and requiring Defendants to take appropriate corrective action to end discrimination in the workplace; and

J.      Such other relief as may be available and which the Court deems just and equitable.

<u>**SECOND COUNT**</u>

**LAD – ASSOCIATIONAL DISCRIMINATION/WRONGFUL DISCHARGE**

162.  Plaintiff repeats and realleges each of the prior allegations of the within Complaint as if set forth at length herein.

163.  As a manager, supervisor, and fellow employee of Mr. Manning, Plaintiff Walters is a member of a protected class under the LAD and has standing to sue Defendants for the reasons set forth herein.

164. Plaintiff Walters was performing his job at a level that met the Company's legitimate expectations from the time he encouraged Mr. Manning to complain to Defendants shortly after Mr. Manning returned from his disability leave, through the termination of Plaintiff Walters' employment.

165.  Plaintiff Walters opposed certain practices and/or acts of harassment, retaliation and discrimination of Defendants and its employees which are forbidden under the LAD.

166.  Plaintiff Walters further encouraged and assisted Mr. Manning in opposing acts of Defendants prohibited under the LAD.

167.  Plaintiff Walters was wrongfully discharged for associating with Mr. Manning.

168.  Defendants' acts or omissions were the cause of Plaintiff Walters's harm and were actuated by actual malice or accompanied by a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions.

169. As a result of Defendants' conduct, Plaintiff Walters has suffered emotional distress, compensatory, and other damages.

**WHEREFORE**, Plaintiff demands judgment against Defendants for harm suffered due to the aforesaid violations of the LAD as follows:

A.      Back pay and benefits;

B.      Front pay and benefits;

C.      Compensatory damages;

D.      Consequential damages;

E.      Punitive damages;

F.      Reinstatement;

G.      Pre-judgment interest and enhancements to off-set negative tax consequences;

H.      Any and all attorneys' fees, expenses and/or costs, including, but not limited to, court costs, expert fees and all attorneys' fees incurred by Plaintiff in the prosecution of this suit (including enhancements thereof required to off-set negative tax consequences and/or enhancements otherwise permitted under law);

I.      Declaring that Defendants have violated the LAD and requiring Defendants to take appropriate corrective action to end discrimination in the workplace; and

J.      Such other relief as may be available and which the Court deems just and equitable.

                              **SMITH EIBELER, LLC**


                        By:    ***/s/Robert W. Smith***
DATED:  June 27, 2018          **ROBERT W. SMITH**
                               **Attorneys for Plaintiff**

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I certify that, to the best of my knowledge, this matter is not the subject of any other action pending in any court or of any pending arbitration or administrative proceeding, except that it is related to and should be heard in conjunction with and consolidated with the action captioned:  Gregory Manning v. Safelite Fulfillment, Inc.,et al., United States District Court for the District of New Jersey, Civil Action 1:17-cv-0284-RMB-JS.  Moreover, this action contains allegations relating to the action captioned:  Shelby Klein v. Safelite Group, Inc. d/b/a Safelite Autoglass, et al., United States District Court for the District of New Jersey, Civil Action 1:16-CV-00726 (JHR)(JS).

                                        SMITH EIBELER, LLC


                              By:     /s/Robert W. Smith
                                        ROBERT W. SMITH
DATED:  June 27, 2018                   Attorneys for Plaintiff


## JURY DEMAND

Plaintiff hereby demands trial by jury on all issues so triable.

                                        SMITH EIBELER, LLC


                              By:     /s/Robert W. Smith
                                        ROBERT W. SMITH
DATED: June 27, 2018                    Attorneys for Plaintiff